We understand all counsel are here and ready to proceed, and so counsel for the appellants may proceed. May it please the Court, I am Laird Ashenbrenner representing the Appellant Villages. I would like to reserve five minutes for rebuttal. You may do so, but you'll have to help keep track of your own time because that will show the total time remaining. Thank you, Your Honor. The basic question here is whether native villages can hold aboriginal title, including exclusive aboriginal fishing rights, to their traditional hunting and fishing grounds on the Outer Continental Shelf. EYAK 1 held that aboriginal title was precluded by federal paramountcy. However, the Supreme Court and this Court have held that aboriginal fishing rights can and do exist 40 miles out in the ocean. The Supreme Court and this Court have also held that only Congress can extinguish aboriginal rights. EYAK 1's holding that aboriginal rights are barred by federal paramountcy amounts to a judicial extinguishment. This violates the separation of powers mandated by the Constitution. In Oneida II, where the tribes had lost possession for over 175 years, the Supreme Court nonetheless upheld their aboriginal title and declared that, quote, the potential consequences, unquote, of recognizing aboriginal title do not justify judicial extinguishment. Mr. Aschenbrenner, if Congress passed the Magnuson Act, and if the regulations promulgated under the Magnuson Act purport to conserve the resource for all users of the resource, why doesn't that constitute, if not an extinguishment, at least a limitation upon the aboriginal right that your client is claiming to the fishery in the Outer Continental Shelf region? Conservation regulations might modify or limit aboriginal rights to the extent necessary to conserve the resource upon which the aboriginal rights are based. Isn't that what we have here? No, Your Honor, we do not have that here. We have a situation where the Magnuson Act does authorize the Secretary to adopt conservation regulations which could apply to aboriginal rights. However, the Secretary's regulations do not even purport to apply to aboriginal rights. Well, I'm a little confused. As I understand your position, the villages are not subject to compliance with these IFQ regulations at all. They can take as much fish as they want wherever they want to take it within the Outer Continental Shelf region that they claim. Isn't that right? Yes, unless and until Congress provides otherwise or authorizes the Secretary to impose restrictions which extinguish aboriginal rights. The distinction I'm trying to make, Your Honor, is yes, the Magnuson Act gave the Secretary authority to impose conservation regulations, as this Court said they could, in midwater trawler. But let me ask you this to follow up with Judge Tallman's question. He asked whether your position was that the villages could take as much as they wanted, either commercially or sport or subsistence, despite the Magnuson Act, despite the other statutes. Your answer was yes, but I'm not sure that's true because your position is they have aboriginal rights, and we do not at this point know the extent of those aboriginal rights. That is to say the aboriginal rights may not be as much as they now want to take. Isn't that correct? No. Well, I'd say no, Your Honor. No, but I'm not sure you understand the point of my question yet. Your position is they can take as much as they are entitled to take under their aboriginal right. Yes, Your Honor. But we do not yet have a determination by the district court as to the extent of those aboriginal rights. Well, we don't have a determination. Well, we don't have a determination yet of whether or not they have sufficient facts to establish their aboriginal right. That's my point. Yes, Your Honor. Mr. Truman, for that purpose, why are we deciding these hypothetical questions as to a possible conflict between a federal statute, a federal regulation, and this hypothetical right that we don't know what it is? Wouldn't the correct approach be to send it back for the district court to determine in the first instance whether there are such rights and the extent there are, maybe when they are found to be. Maybe all they have the right to do is to go out in their dinghies and throw a line in the water made with a fish hook made of fish bone. Maybe that's all the rights they have. I mean, the court, the district court have done just what you're saying, Your Honor, but it bifurcated the case and decided to determine the legal question first. Well, I know what the district court did. What I'm saying is we're being asked to answer a hard question based upon this hypothetical right that you don't know what it is, I don't know what it is, nobody seems to know what it is, and for us to determine whether there is a conflict between federal law and federal regulation and this right that we have no idea what it is, why shouldn't the district court figure out what it is first and then we can answer these difficult questions. Well, I'd respond this way, Your Honor. We all know what aboriginal title means because the U.S. Supreme Court has repeatedly told us so. It means the exclusive right of use and occupancy, which includes the exclusive right to fish and hunt and exploit all the other natural resources in an area. Now, that's what aboriginal title is, and remanding it back won't change that. So you're not claiming a concurrent right. You're claiming an exclusive right. That is correct. You're claiming then that the entire IFQ system in the Magnuson Act and the Halibut Act gets subordinated to an exclusive right, actually gets junked, none of those people can go out and fish. It just simply doesn't apply to the aboriginal territory. I want to know what you mean by it doesn't apply. Do you mean that the natives with aboriginal rights should have a monopoly on commercial fishing in the 200-mile zone? No. Well, only within their aboriginal territories. The answer would be yes, unless and until Congress provides otherwise, which it certainly can. Why shouldn't we read the Magnuson Act and the Halibut Act to provide otherwise? I think it's well established that aboriginal rights are subject to the plenary power of Congress. Yes, Your Honor. So why shouldn't we read those two acts, which say that otherwise, what the acts basically say, as Brown explained, is that we'll run out of fish, like the great banks on the east coast of Canada, if we don't have some scheme, such as the IFQ scheme, to allocate them? The problem with applying the IFQ regulations to aboriginal rights is it would effectively extinguish those rights because it would bar the tribes from exercising their rights in their own territory, and it would let non-tribal members fish there. Let's say you're right that it would effectively extinguish the right if it's exclusive. Congress has the power to effectively extinguish the right. Why shouldn't we read the Magnuson and Halibut Acts as having done so? Because the Supreme Court in Oneida and Santa Fe and this Court in Eberhart have said that you cannot extinguish aboriginal rights unless the intent of Congress is plain and unambiguous. It is plain. They said right in the act what it did. They used words such as all in the act, and they explained as the purpose of the act, conservation of fish in such a way as to be physically incompatible with an unlimited native fishery. That would be directly contrary to this Court's decision in U.S. v. Dan in Cheney v. Ringroves? Let me ask you a practical question about this. Basically, you need an IFQ for commercial fishing. Yes. There's also sport fishing. Everybody but natives gets two fish a day. Natives get 20 fish per day, and they get an additional month. Halibut run, all small ones, maybe 30 pounds. So you're looking at 600 pounds per day per person. If you assume half of it is waste, and that's really high for waste, gills and fins and guts and so forth. You're talking 300 pounds of fish per day per person. And fishing is open to natives for the additional month of the year, all 12 months of the year. No one can eat that much fish. So what you're talking about here is unlimited commercial fishing as an exclusive aboriginal right based on the quantity of fish that you're saying is not enough. Is that right? That is precisely what this Court said in U.S. v. Washington and Midwater Trawler. You are claiming that. Aboriginal fishing rights give the right to fish for any species, quote, without limit. You are claiming that. It includes. Unlimited commercial exclusive fishing right for natives and the end of the IFQ system that Congress mandated in the Halibut Act and the Magnuson Act. The Congress' IFQ system applies to every other area, which is 99 percent, probably, of the OCS. It just wouldn't apply in the limited areas where these five villages have aboriginal fishing grounds. Have those areas been defined? Pardon? Have those areas been defined? No, they won't be until you remand it back for a factual decision. They have been defined in the plaintiff's maps and evidence that were submitted along with our motion for summary judgment, yes. But the Court hasn't ruled on that yet. Absent a determination of those areas, how could we possibly answer the question that Judge Kleinfeld just asked you? I don't think I understand that question. Well, his question was, doesn't this mean that the natives are claiming exclusive commercial fishing rights to the exclusion of the IFP and the ignorance of the Magnuson Act and the Halibut Act? Within their traditional territories, yes. It just means that the second. I'm simply trying to put the horse in front of the cart for me. It may not be the same for the other judges up here. How do we know the impact if the area hasn't even been defined? Well, it'll have some impact unquestionably. But all the secretary has to do, he could do it tomorrow under his present authority. He could adopt some new conservation regulations that would have an aggregate harvest limit, not an individual harvest limit for the tribes. The resources could be perfectly protected, but his conservation regulations that were going to apply to aboriginal brides would be separate and distinct from his conservation regulations applied everywhere else on the ocean. Mr. Eschenbrenner, bringing this back to IAC 1, we recognize the difference between exclusive and non-exclusive rights. What is the practical result or the practical significance of our holding in IAC 1 that prejudices your client? Well, I'm not—of your holding in IAC 1? Well, you're obviously here to ask that IAC 1 be overruled. Right. And I'm asking you, what is it in the holding of that case that prejudices your client? We recognize that your client had rights. They were simply non-exclusive, that's all. Nothing changed other than it was subject to wider use. The problem with IAC 1, so far as the villages are concerned, it would permit others to fish in their aboriginal territory. You not only held that it was—you held that the villages could not claim aboriginal title to the OCS, not just fishing rights. If they can claim aboriginal title, then they're entitled to not only fish without limit until Congress provides otherwise, or the secretary does, under separate regulation, but they would have the right to exploit all other resources, including mineral resources. Is that an issue? So it makes a big difference whether they can have aboriginal title or non-exclusive rights. So that issue is not in this case. We're talking about sablefish and halibut, are we not? You mean the present case? This case. The present case, we are limited by ratio to cotta by IAC 1 to claiming only non-exclusive halibut and sablefish in this case. I don't see how that hurts you. My question is, give me a practical example of how the villages are hurt by that or prejudiced by that. Well, I think I just tried to explain, Your Honor, that if we can claim aboriginal title, others can't fish in our areas. If we can claim aboriginal title, we can exploit all the resources, including mineral, exclusively. So what this is really about isn't fish. It's oil. Well, it's about both fish and oil, Your Honor. Aboriginal right to extract oil. Mr. Gordon, you said that it includes the rights to all resources, mineral, fish, game, et cetera, until Congress provides otherwise. Well, may I clarify that? I'm a little confused as to whether Congress has to say it or whether, at least with respect to the fish, it's good enough for the Secretary to say it. Well, if the regulations would effectively extinguish their aboriginal rights, which these do if you apply them, Congress must first plainly and unambiguously delegate the authority to the Secretary to extinguish rights, which he hasn't done. Can I ask you this? I think I've heard you say two different things about what you are seeking to establish in this suit. You began by saying that you sought to establish the exclusive right of the villages to do this fishing. Yes. And then a moment ago, you talked about wanting to get only the non-exclusive right. What specifically did you ask for in this? I'm leaving aside race judicata, but I'm asking a different question. What specifically did you seek in this lawsuit, exclusive or non-exclusive? In this lawsuit, non-exclusive. So that's the only issue now in front of us is non-exclusive rights? Also before you is the question of whether or not you should overrule E-Act I, because if you do... I have to ask you this, but if the only thing you sought was non-exclusive rights, how can we give you exclusive rights when you haven't even asked for it in this lawsuit? We can't in this case. But if you overrule E-Act I, we will immediately file a Rule 60B motion in E-Act I asking you to vacate the judgment and remand it back and give the villages an opportunity in that case to factually establish their aboriginal rights. Is there a practical difference between exclusive and non-exclusive? There's only so much halibut out there that can be safely taken. And if I understand correctly, your claim of non-exclusive rights means anybody who's a villager can go out there and operate a commercial fishing vessel and take as much halibut as he and his vessel and vessels that he owns takes. Of course, every fish that they take has to come out of everybody else's license because you can't allow everybody else to fish as much as they would otherwise. Otherwise, you kill off all the halibut, right? So as a practical matter, doesn't that mean essentially that the villagers would get a monopoly on all fishing licenses up to the amount of halibut that can be caught, say, consistent with the Magnus Act? No, Your Honor. In midwater trawling... What would be the stopping point? What would keep the villagers from getting a fleet of... A conservation regulation... But you can't... Consistent and necessary to perpetuate the species... That's right. That's why I said it's a zero-sum game. The government determines every year you can take so many halibut safely. If you take more than that, you start depleting the halibut. Right. Now you've got commercial fishermen coming in and they get licenses and they're fishermen. Now if your clients get a fleet of boats and say, we have the non-exclusive right to go fishing out there, the government is going to have to give us fewer fishing licenses to everybody else because otherwise you kill off the halibut. So what is it that... If you get a non-exclusive right, what is it... Why should your clients stop short of getting a fleet of fishing boats and go out there and get first dibs on the halibut and take every single halibut that's permissible under the... Consistent with the conservation measure. Not even one fish more than that, but everything. Every single fish that's allowable under the Magnuson Act. Well, it's a practical matter, Your Honor. Something like 98 or 9% of the OCS is not claimed by these five villages. But there are other villages who would just jump on top of this... Pardon? There are other villages who would just jump on top of this decision and say, me too. That is correct. It will set the precedent for some other 50 coastal villages. Correct. So is there... As a practical matter, there is no difference between a non-exclusive right and an exclusive right because, of course, these are valuable licenses. And if you have the right to go in and take first fish non-exclusively, you can take as many fish as you can take without... and push everybody else out. In fact, you have the economic incentives to do that because everybody else has to go out and get a license. Isn't that the practical consequence of your position? Well... And there's nothing in I Act I that prevents that. Pardon? And there's nothing in I Act I that prevents that. Is there? Well, no, but the Secretary can prevent it and the Congress can prevent it. Why haven't they prevented it already? I mean, Cohen says, such rights of hunting and fishing as the Indian tribes may enjoy are subject, in the first instance, to federal regulation. We have federal regulation in the form of two statutes, the Magnuson Act and the Halibut Act. We have an intricate set of regulations implementing them for the purpose of eliminating just what Judge Kaczynski described, the elimination of the halibut, out of a very realistic fear. Why hasn't Congress already limited it? Well, because they have never plainly and said in plain and unambiguous terms, Mr. Secretary, you're authorized to extinguish or restrict Aboriginal rights. What you're saying then is that a scheme inconsistent with the Aboriginal rights that you claim does not eliminate the Aboriginal rights unless Congress says Aboriginal rights. Well, it doesn't have to say, quote, Aboriginal rights, but according to Oneida and Santa Fe, it's got to be a lot clearer than the Magnuson. I don't understand what's not clear. I don't understand what's not clear. They don't have to say, quote, Aboriginal rights. In the savings clause in the Magnuson Act, in the savings clause in OXLA, Congress made it perfectly clear that it didn't want Aboriginal fishing rights extinguished. In fact, it said that they have to. Recognized by law. Pardon? Recognized by treaty or recognized by law, by statute. It doesn't say anything about Aboriginal rights. Well, the OXLA sure does in the legislative history. There are no treaty rights involved here. That's the Indians in Washington. Can I interrupt and get the language of the savings clause in the Magnuson Act? What does the specific text of the Magnuson Act savings clause say? Magnuson Act says any regulations adopted by the Secretary must be consistent with other applicable law. Other applicable. It does not say statute law. It does not say treaty law. It says law. That is correct. And under our construction given to us by the Supreme Court, law includes Aboriginal rights. That is correct. That's the normal black letter law on that point. That is correct. And that's what this Court held in Parabono, that Indian treaty rights were other applicable law. What makes this, what makes something an Aboriginal right? I mean, can you just come along and say we have the right? No, you have to. They have to demonstrate exclusive use and occupancy for a long period of time. Wait a minute. Why does that turn into a right? Captain Ahab goes out there and fishes whales for an entire life. He doesn't get an exclusive right to fish whales in the open seas. Why does the fact that they have gone out there in the past and done this, why does that somehow give them Aboriginal rights? Well, because the Supreme Court from Chief Justice Don Marshall down to Oneida most recently and this Court's decision in Eberhardt have said that a long-term exclusive use of occupancy. Those are all in the context of uses on land or coastal land where you can establish where the common law recognizes rights by usage. But we have never recognized the rights of the open sea. Yes, you have, Your Honor. We have? Yes, you have. Where is that? The treaty fishing cases in Washington, as the Supreme Court said in U.S. v. Winans, that an Indian treaty is not a grant of rights from the government to the tribe, but a grant of rights from the tribe with all those not granted reserve. Counsel, you have about four minutes left. Okay. And, therefore, in midwater trawler in U.S. v. Washington and a fishing vessel by the U.S. Supreme Court. Answer this question in the limited time you have. Where does the fact that Indians have done something turn into an Aboriginal right? There are all sorts of things that you could have done in the past that don't give you a right. Just showing you have done this and done this before doesn't necessarily give you a right. The Phoenicians used to go out to sea thousands of years ago. They didn't give them rights to the Mediterranean. What is it that your clients must show before they can assert an Aboriginal right? I just don't know how to answer other than what I've already said, which is a factual proof that they've done it before. Yes. You think the fact that they've done it before is enough to establish a right? Yes. That's what the Supreme Court expressly said in Santa Fe. Okay. Counsel, you have a little over three minutes left. Thank you.  I am David Shilton, representing the Secretary of Commerce. With me at the council table is Robert Batson from the NOAA General Counsel's Office. The district court in this case ruled that the natives' assertion of a right to fish free of federal regulations based on Aboriginal rights was precluded or barred by the doctrine of federal paramountcy. We think that's correct. And even though there are some other defenses we think would be applicable, we think that that's the rationale that should apply in this case. It's the rationale of E-Act I. And even though this case involves non-exclusive rights, whereas E-Act I involved Aboriginal title and exclusivity. Would paramountcy extinguish all rights, or would it only extinguish inconsistent rights? It would extinguish all rights. It's a categorical doctrine. Isn't it the right to go out there in a rowboat and throw a hook in the water and take fish to feed your family? As long as that's consistent with the federal law and regulation, you can do it. All right, so we need consistent rights. I just asked you that question. These are all rights. Well, any right in the nature of a property right assertion. That would be if Congress passed a law that said nobody can go out there and drop a hook to get fish to feed his family, right? Right. And we're talking about more than three miles out, right? We are talking about more than three miles. We're not talking about within three miles of shore. Absolutely. Now, as I recall, I don't recall anything in the record that showed that any of the Indians involved or any of the natives involved had done any fishing, subsistence or otherwise, more than three miles out from shore. I remember there was some archaeologist who said no sable fish bone had ever been found in any site. Was there evidence that anyone had fished more than three miles out? I think it's fair to say that both sides have introduced evidence which is conflicting. Our anthropologist report said no, that there is no evidence. You've got somebody who says that maybe they did fish out there? Right. It's not near shore. I mean, usually you go halibut fishing near Valdez or Homer or any of those areas. You do it within sight of shore. Right. Our anthropological experts said there would have been no reason to fish for halibut beyond three miles. When is the right frozen in time? I mean, suppose, can we go back 70 years and say, well, we had motors at that point and therefore they could go out further than three miles and they were just continuing their aboriginal fishing that began 7,000 years ago but now they have better equipment to do it so they can go farther? Well, it depends on how the court defines a right and whether there is a right. If the Village of Gambell Three case were to govern, that would mean continuation of traditional subsistence. In our view, Village of Gambell Three was incorrectly decided because even those rights would conflict with paramountcy on the outer continental shelf. But the actual extent of the aboriginal rights claimed in this case, to the extent that they exist at all, has simply not yet been determined. That's correct. So that question is not in front of us. That is correct. Let me ask you about the paramountcy doctrine. My understanding of the paramountcy doctrine is that it was established as between the federal government and the states and that the actual paramountcy cases of the United States Supreme Court do not involve Indian rights or Indian aboriginal rights. Is that correct? That is correct. But the rationale of the cases... Is there any statute underlying the paramountcy cases that would, considered as a statute, abrogate aboriginal Indian rights? No, the paramountcy cases weren't based on statute at all. What I'm after is, we have sort of a boilerplate black letter law that says Congress has unlimited power to limit Indian treaty rights, Indian aboriginal rights, and so on, but it's a congressional power. Indeed, it's a congressional power that under our case law has to be exercised clearly and unambiguously. So my question is, if there is no statute underlying the paramountcy doctrine that speaks at all to Indian rights, how can the paramountcy doctrine limit aboriginal rights? Because the doctrine is more foundational, and it's really based on constitutional underpinnings. But the constitutional interpretation given to us by the Supreme Court is that to take away aboriginal Indian rights, you have to have a statute. There is no statute. If you're looking at the paramountcy doctrine, which is a judge-made law, without the assistance of statute, to abrogate Indian rights, that sounds like judicial activism. Well, it's not abrogation, and it's not taking away, because they simply could not have ever arisen on this area, the oceans, which are this unique jurisdiction. You're saying your position is there never were any aboriginal fishing rights, period? That's on the oceans. That's correct, because as the Supreme Court... Now, I think you're even taking me within the three-mile boundary. Well, we don't obviously have to... But you just told me there never were any Indian aboriginal rights, correct? Any Indian aboriginal fishing rights. That could be asserted against the United States, as these are here. I don't think there could be, because once the United States asserts its jurisdiction over the oceans, then all property interests have to coalesce and unite in the national sovereign. Where has the United States asserted its interest here? In what congressional act? It started out with really the Truman Proclamation in 1945. It was the first assertion of the United States' rights over the outer continental shelf. That was basically codified in the Outer Continental Shelf Lands Act of 1953. As to fishing, it would be the Magnuson Act in 1976, which asserted exclusive fishery authority over fish in the exclusive economic zone up to 200 miles. So there have been a number of actions. But... But it doesn't mention aboriginal rights. No. And Mr. Aschenbrenner, refer to the Outer Continental Shelf Lands Act of 1953. But that has a savings clause, but it only applies to any rights, if any, that have been acquired under a law of the United States. And aboriginal rights are not acquired under a law of the United States. Are they acquired? That word is not in that statute. In the Outer Continental Shelf Lands Act... 16 U.S.C. 1342, nothing herein contains shall affect such rights, if any, as may have been acquired under any law of the United States. Sorry, I apologize. I was thinking of another statute. But so federal paramountcy, as a doctrine, simply means that there cannot be conflicting claims of rights in this area, and the reason being... What is the position of the United States as to what point a practice comes into a claim of right? Let's say, for example, we used to claim rights only out to three miles, right, until Truman Doctrine. Right. And let's say it turns out somebody can show that... This is a regular Anglo person. Can show that going back to 1762, he and his four bears had been going out 300 miles out to sea and fishing out in the middle of the ocean for 300 miles. Would that be a property right, by doing that, that we would be recognized in any sense? So that if the United States were to then extend, let's say, the 200-mile limit to 300 miles, it might have to pay compensation? I think Indian rights are different in this area. The aboriginal rights have a different kind of status than another person. Is this just usage, just doing something with establishing a right? No, no, it has to be based... What does it take? It takes exclusive use and occupancy is the test for aboriginal title, and aboriginal hunting and fishing rights are part of the package of aboriginal titles. So I think what would have to be shown is... But exclusive in the middle of the ocean means something quite different than exclusive on land. Exclusive on land means that the people on the other side of the hill, don't they come over here, I mean, they want to come over here and try to hunt, whether they shoot them or club them or whatever it is, whereas if you go out 300 miles in the ocean, there's no one else to be exclusive. I mean, nobody else is there. Yeah, this is one of the difficulties we have with the idea of aboriginal rights and aboriginal title in the ocean, is that how do you show exclusive use and occupancy of an area which under international law, you can't exclude others from? And I think that's one reason why there haven't been cases finding aboriginal rights and title on ocean areas. If you could exclude, it would turn the Straits of Tehran and the Formosa Straits and all these other critical waterways around the world into the controlled property of the adjacent nation. That is certainly one of the concerns. It would pretty much eliminate the U.S. as a seafaring power. I don't understand this debate. I think what we're talking about is exclusive fishing rights, not exclusive territorial rights in the sense of land, in the sense of being able to exclude boats from traversing the area. The Indians here are not claiming exclusive rights in the sense of excluding all boats from this territory. They're claiming exclusive use rights as exclusive fishing rights. Just to exclude other fishing boats. Other fishing boats that are fishing. That's correct. But I think if the principle, if the Indians can do that, that is an assertion of a type of sovereign interest. I understand that. But we're not talking about the Indians wanting to keep other boats from going through the area. We're only talking about Indians wanting to keep other boats from fishing in the area. But that's still a major… I understand that. Of course. The problem with… The problem is part of the definition of property right, isn't it? Exclusion, right? It's exclusivity. And if you're not trying to exclude, then maybe you're not really establishing a property right. And we think that even if you… I mean, you've done it. You've done it in the past. You can do it again. But if you're not trying to establish exclusive control, then maybe you're not establishing a property right. And if you do, then you get into the problem of just profit points out. If you are trying to exclude everybody else from fishing here, then you get into the slave-and-immortal problem. You do. I think there's aspects of both a property right and a sovereignty right in what the natives are asserting here. And if that shows… This is why I'm asking the question, because all I can… all I see based on their pleadings is they can show, they think, if we believe all their proof, that they have done this in the past. And I have never understood we have done something in the past to be sufficient to establish a property right, aboriginal or otherwise. There's lots of stuff you've done in the past, but unless it's exclusive, unless you have some sort of assertion of rights vis-a-vis other people, it doesn't mature into a right that our law recognizes. And especially at sea, again, as Justice Crawford points out, we've had lots of law for thousands of years, or at least centuries, going back that says you can't establish rights in the middle of the ocean to exclude other people from doing anything, because that's inconsistent with seafaring. I think you've identified a number of problems with the right they assert. I think what the district court did here was to correctly really cut to the chase and say putting all those problems aside and putting aside the fact that if there were rights, they could generally be regulated by conservation regulations. We just have a fundamental problem with federal paramount sea. Counsel, I'm wondering if you need as much as you're contending for, and it may be that you do, it may be that you don't. Here's what's on my mind. It has to be perfectly clear that Congress is subordinating aboriginal rights, whatever they may be, to some congressional scheme. I'm wondering why the Halibut Act and the Magnuson Act are not perfectly clear. They speak very broadly of the need to avoid destruction of the fishery by controlling all of the fishing in the Halibut and Sable fisheries with the IFQ system for commercial fishing, which is what we're talking about here. The subsistence fishing, what's already allowed, is way more than anyone could eat. We're talking commercial fishing. The Halibut and Magnuson Act, I don't understand why they're not perfectly clear. What am I missing? No, I agree completely that it would be sufficiently clear if there were aboriginal rights in this ocean area to extinguish them. Actually, in terms of winning this case, you can live with Gamble 3 because aboriginal rights, whatever they may be, are subordinated to the IFQ system. They are subordinated, but as has been pointed out, there are some 50 coastal villages, and if we have Gamble 3, we'll be lifting these issues for a long time to come. No, that's not true. Because as I understand it, the worst that could happen by following Gamble is that you have this litigation until Congress makes it a little clearer. It's always possible for Congress to do that. You're right. But the nature of federal paramount is such that Congress really shouldn't have to do that. What exactly would happen unless Congress acts under Gamble 3? So what would be the consequence? Gamble 3 contemplates that villages can have a right to prevent interference with subsistence uses. It's not exactly clear what the bounds of that right are. But Gamble 3 limited subsistence uses, not commercial uses. On the face of that opinion, yes, it talks about subsistence uses. It would not cover commercial fishing, in our view. But it only dealt with subsistence uses. Is it clear that its logic extends only to subsistence uses? We think its logic is limited because Gamble 3 did recognize that federal paramountcy does apply to assertions of aboriginal claims on the Outer Continental Shelf. But found that federal paramountcy still left some room based on policy and humanity, the policies from the aboriginal title cases, to allow continued subsistence uses and assertion of that right. In our view, basing that on policy and humanity is really putting the courts in a role where Congress should be, that only Congress should determine whether to cede some of the federal government's paramount authorities. Not if you would say that it's consistent with the federal interest to recognize aboriginal rights until Congress declares that there's a federal interest that's inconsistent. What's wrong with that? In our view, there is an inconsistency with federal interests. It's the inconsistency identified by the Supreme Court that the nation has to be able to speak with one voice when it comes to these areas of the ocean and therefore has to have complete and sole dominion over the resources. It does speak with one voice in deciding how much fish can you take. And then the question of who gets the fish first gets decided by the Southern Regime, which means that if you are somebody other than an Indian, you have to get a permit. And if you're an Indian, you just go out there and do it. And you do it until you run out of fish or until you reach a limit. And by God, the limit set by Magnuson is an upper limit, but the Indians get first claim. There's no inconsistency there, right? Well, no, I think the existence of this separate regime is problematic under the Paramount CK. It matches two things. One of them is it sets a limit. It says, you know, we'll figure out how many halibuts you can safely take. And the second one is it allocates it between users, right? Right. The claim they raise does not in any way interfere with the first of those. They are not saying we can go out there and fish the ocean's clean halibuts. I think they are perfectly willing to abide by the limits set by Magnuson. So now we're getting down to the grubby question of who gets the fish. Right. And even in determining that, I think that an inconsistent claim is problematic with Paramount C because there's an international aspect to determining who gets the fish. I mean, since we're in the area of the oceans, there is an international law principle that if United States fishers can't use all of this— Well, from the preservation point of view, it makes no difference. Certainly from the point of view of the fish, it makes no difference whether the fishing is done by Indian villagers or by commercial fishermen, right? From an American economic perspective, you know, the U.S. economy, it really doesn't matter. Somebody goes out there and gets the fish and sells them. This is really a dispute between who makes the money harvesting the fish. Is this going to be done according to the system set by the Magnuson Act, where you get these quarters, or do they get first dibs and therefore they will go in and get every fish they can be gotten because they have the exclusive right to do so. What is the federal interest as between who gets the fish? Well, that essentially would be like a treaty right, which Congress has ratified and determined is appropriate. And here it would be a court determining that X amount of the fish available would go to this group. And we just don't think that that should happen without a congressional determination. Wouldn't it make more sense to figure out first what these rights are before we answer mega questions like whether there is an appearance of paramount? I think if the district court, if you go back and the district court looks at this and says, look, all this, you know, yes, they have rights and they've proven them, but all is involved if you send a few sail-powered boats out there and put in a few hooks and get fish to feed their families, and that's the extent of the rights, it would look a lot different from a right to put a fleet of fishing boats in the water and scoop up every fish, every halibut that you can get down there. It would be different. Paramount's doctrine seems to me they would be different. Well, in our view of the paramount doctrine, it being a categorical doctrine, you don't need to have that factual fleshing out of what is the scope of the right, because it is categorical. Any inconsistent property right would go. I'm sorry, we think the district court is inconsistent. Whether it's inconsistent with having a few villagers going out there and putting hooks in the water and getting enough fish to feed their families is in any way inconsistent with running a system that involves a policy of hundreds of tons of halibut every year by commercial vessels. I mean, it wouldn't make any difference at all. It would have no effect, no practical effect whatsoever. So where would be the inconsistency? Well, I think that the Supreme Court, the way it looked at it, it didn't look at whether a particular assertion by a state to what degree that was inconsistent. It simply said that property rights generally have to coalesce in the national sovereignty. Counsel, I see your point on that, and I think it's a substantial one, that the paramount doctrine means that all the rights are held by the national government. However, even if we were to assume otherwise, even if we were to assume gamble three, I'm having trouble seeing how this is somebody dropping a line in the water to feed his family. We're talking here an absolute bare minimum of 300 pounds per day for every man, woman, and child out there on the boat, 365 days a year of permissible fishing under the system that the villages are challenging. No one can eat that much fish. I'm also thinking this whole thing is kind of fictional. You'd need an awful long string to fish more than three miles out, and no traditional fishing method without steel cables and motorized winches could possibly have done it. I'm thinking the whole thing is fictional. Of course we're talking tons of fish. We're talking control of the entire fishery. Yeah, this case is about commercial fishing. It has to be tons of fish. You've got tons of fish just with one family out on a boat. Now, with 20 fish per day per person, you get a large family out there on the boat. You've got tons of fish. The case definitely involves a large amount of fish. We absolutely agree with that and shows the problem and the conflict with the federal paramount seat. There's another reality, too, is that if all you've got is the right to go out there and put a line in the water, as permitted by the regulations, somebody would bother doing it. You wouldn't buy the big boat to do it. Really, this is all about the right to send motorized boats out there with huge equipment to haul tons of fish. It wouldn't be worth the trouble to be here discussing this case if there were anything else at stake. I'm sorry to understand. Well, that's leading to my concern. Why has an 11-judge in bank court been convened? You would like us to overrule Gamble 3, at least in part. Mr. Aschenbrenner would like us to overrule IAC 1. I'm wondering why we have to do either with respect to the narrow issue that is presented in this case. Specifically, what was it that Judge Holland held that is under review at this point? He held that the native's claim to non-exclusive fishing rights was barred by federal paramount seat, that the rationale of IAC 1, even though IAC 1 had to do with aboriginal title and exclusive rights, that it equally applied to non-exclusive rights. Is that holding consistent with Gamble 3? It can be made consistent, but it's difficult. There's definitely tension there. And Judge Holland pointed out that tension. But since Gamble 3 just involves subsistence uses and this case involves commercial, that's certainly a distinction. There's a greater conflict here because the native villages are trying to stop the application of a federal regulation that's generally applicable. That's more than that was indicated. But do we have to get into Gamble 3 and IAC 1 to decide whether or not these particular plaintiffs are subject to the halibut rules and to the sablefish rules? I think the better course is to do that because, in our view, Gamble 3 incorrectly assumes that there can be these property rights on the Outer Continental Shelf, even though they're limited. And we think that's incorrect. But they're not invoked in this case, are they, or in play in this case? The plaintiffs do. Because they formed the case by their complaint, and all they're asking for is non-exclusive, not exclusive rights. I'd see it differently if this were an exclusive fishing case, which it is not. It's non-exclusive but would allow commercial harvesting, potentially large amounts. And so we think that's a serious issue with Paramount. Is your concern, Mr. Sheldon, that if we don't overrule Gamble 3, at least in part, that the next lawsuit is going to be a claim by the villages, let's say, to block development of the Outer Continental Shelf because it now interferes with subsistence fishing as opposed to commercial harvest? Yes. In fact, at the very beginning of the case, there was a claim involving an oil and gas lease sale that was proposed in Cook Inlet, which then didn't go anywhere. But, yes, sure, that's lurking in the background. What did Judge Holland articulate as the Federal interest that is Paramount to the aboriginal claims? Well, simply that all property interests have to coalesce in the sovereign. So he didn't really look at it as So there can be no aboriginal claims because the existence of the Federal Government's interest or existence of the Federal Government wipes them out? Exactly. This is a very unique area that the law and the common laws that's developed on land doesn't apply in the same way. We're talking high seas here, more than three miles out, right? Exactly. And the states in the Paramount cases assume that the common law that had always given states the bed and banks of navigable waterways, Pollard's last sea law, would apply within three miles. And the Supreme Court said no. This is just a different jurisdictional area. And the laws we've noted on shore doesn't apply because we just have these different interests at stake in this international domain of the oceans. And all sovereignty and property interests must coalesce and unite in the Federal Government. I understand that the Federal Government clearly has the power to say that all interests must coalesce in the national sovereign, including interests that might previously have been asserted by the Indian tribes. Yet our ordinary doctrine requires that there be some clear expression of congressional intent to abrogate Indian aboriginal rights. And I find none either in any statute underlying the Paramount's doctrine. Well, it – again, I – I concede the congressional power. Under this view, those rights never arose. Because before any – before a country asserts jurisdiction over ocean areas, rights like that just can't arise. And so when the – But that doesn't say before the United States did it. Maybe the United States didn't arise – right didn't arise. But this is an aboriginal right asserted by the Indian tribes. And if it existed, it existed before the United States existed. That's the premise for the aboriginal rights. Yeah, that's – It's the premise. But I think that's a premise that the Supreme Court cases would not allow here. And so I don't think you need a clear extinguishment just as in the rights of the states. They simply were barred, precluded. The Court never depicted it as an extinguishment of rights. It's simply that under the constitutional system, they cannot coexist. Well, okay. Thank you. Your time has expired. Thank you. May it please the Court. Just six – five years after AINSCA is when the Magnuson Act was passed. In AINSCA, when the Court wanted to extinguish aboriginal rights, it said, quote, all aboriginal titles, including aboriginal fishing rights, in Alaska are hereby extinguished, unquote. In other words, Congress knows how to extinguish aboriginal rights when it wants to. Mr. Ashmeyer, I thought I heard you concede in your opening that the tribes for conservation for conservation purposes could be restricted in the total amount of fish that they could take in order to protect the resource. Is that right? That is correct. If that's the case, then doesn't that answer the question? If they are subject to the regulatory scheme of these two statutes, then their aboriginal rights must give way when Congress enacts a scheme to protect the resource. Their rights only give way to the extent that those regulations are conservation regulations. The regulations we're talking about are not just conservation regulations. They allocate the fishery between sports, subsistence, and commercial. So we really are back to Judge Kaczynski's point. Is this a question of who gets the fish, however much there is to get, without destroying the resource? I don't see why they're not conservation regulations. It says right in the statute, 16 U.S.C. 1801A6, a national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to ensure conservation, and to realize the full potential of the nation's fishery resources. It says conservation right there in the statute. That's what it is. One of the purposes was conservation. Another was to allocate the resources between user groups. No. The purpose is conservation. The means is allocation. And the means is, under CFR 676.13a, that any boat that fishes commercially for regulated fish in the regulated area must have an individual quota share, IFQ permit, on board, specifying the individual fishing quota allowed for the vessel. And anyone who receives the regulated fish must possess a registered buyer permit. Now, the plaintiffs in this case say that that scheme, which the statute makes the means to achieve the conservation end, violates their aboriginal rights and is null and void as applied to them. Right. To the extent that it does more than conserve the species, the purpose was that it had other purposes. Is this correct? It doesn't say it has other purposes. In Midwater. Where are you getting the other purposes from? I'm reading the statute. Well, the secretary, in his briefing, has repeatedly acknowledged. I'm getting my purposes of Congress from what Congress said. Show me where Congress said that the purpose is something different. What it says here in the statute is that the purpose is conservation. You may ask a question. I can't give you the section, Your Honor. Okay. You can't give a section? No, I can't. I'm sorry. Would you repeat your answer? I can't give you the section where it uses the word allocation. But you do agree that the limit set by the Magnuson Act, you abide by that. Pardon? You would abide by the limit set by the Magnuson Act, set under the Magnuson Act. You don't have to go out there and get more fish than is allowed under the Magnuson Act. Well, under separate conservation regulations that the secretary would adopt to apply to the tribes, we'd be limited if it was for conservation purposes. That's what Midwater Trawler says. How do you recognize that right? Pardon? Why do you recognize that limit? Because Midwater Trawler says that aboriginal fishing rights reserved in the treaty fishing cases can be regulated solely for conservation purposes for no other purposes. Non-treaty fishermen can be regulated for any other legitimate purpose. But treaty fishermen, and we're talking about reserved aboriginal rights under the treaty, can only be regulated by conservation regulations necessary to perpetuate the species. You have exceeded your time. Thank you. Thank you. The matter is currently submitted for decision. The session is closed. I would like to thank all the members of the Council for their participation in my hearing. We will now depart. The minutes for this session stand unannounced. Thank you. Thank you. Yeah, it's not in there. Thank you. Thank you. Thank you. Thank you.
judges: Schroeder, Kozinski, O'scannlain. Kleinfeld, Hawkins, Thomas, W Fletcher, Paez, Tallman, Rawlinson, Clifton